MEDINA LAW FIRM LLC
The Chrysler Building
405 Lexington Avenue
Seventh Floor
New York, NY 10174
Tel. (212) 404-1742
Fax. (888) 833-9534
*Proposed Attorneys Hayden-Harnett, L.L.C.*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>HAYDEN-HARNETT, L.L.C.<br><br>Debtor-in-Possession | Case No.<br><br>Chapter 11 |

**AFFIDAVIT OF BENJAMIN HARNETT: (I) IN SUPPORT OF
FIRST DAY MOTIONS AND APPLICATIONS; AND (II)
PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4**

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF OTSEGO     )

    I, **BENJAMIN HARNETT**, of full age, being duly sworn according to law and upon my oath depose and say as follows:

    1.    I am the Chief Operating Officer and fifty-percent (50%) co-owner of Hayden-Harnett, L.L.C. ("H&H" or "Debtor"). I make this affidavit in support of the Debtor's First Day Motions and Applications (discussed below) and in compliance with Local Bankruptcy Rule 1007-4 (this "Affidavit"). Unless otherwise set forth herein, I have personal knowledge of the facts set forth herein or have consulted with responsible parties with personal knowledge concerning these matters and if called as a witness I could and would testify competently thereto.

1

2. H&H is a fashion design company. It designs, develops and manufactures women's fashion accessories and apparel and sells them under the brand name "Hayden-Harnett" a/k/a "H&H." At the present time, H&H operates one retail store located in Greenpoint, Brooklyn and sells the remainder of its merchandise through: (a) its internet website (identified by the uniform resource locator www.haydenharnett.com (the "Website")); and (b) wholesale to select retailers.[1]

3. H&H's merchandise is manufactured in New York City and the remainder is imported from certain overseas vendors.

### A. Background & Origins

4. Hayden-Harnett was founded in 2005 by myself and Ms. Toni Hacker; H&H's other fifty-percent (50%) co-owner ("Ms. Hacker"). Drawing from mutual experience in the fashion industry both Ms. Hacker and I were determined to bring something different to the industry. In that same year, we launched the Website and designed a collection of fabric handbags with leather trim for H&H's first summer collection. We identified certain key stores which we thought would be ideal points of sale and sold our collection on consignment at these stores. With Ms. Hacker's experience working with overseas manufacturers and her experience sourcing, we developed a leather handbag collection and sold it into a nationally recognized and well known New York City chain of department stores. With these early sales and accomplishments, H&H began to expand rapidly.

---

[1] H&H's Website enjoys a customer list of approximately 40,000 subscribers and maintains a wholesale contact list of approximately 500 individuals and businesses.

B. **Early Success**

5. H&H's initial orders were financed by a personal loan of $15,000 to Ms. Hacker from a close family relative. With the proceeds of sales in hand, we reinvested everything into the business in order to fund its expansion. By 2006 myself and Ms. Hacker moved the business out of our apartment and took up an office in Greenpoint, Brooklyn. Sales continued to increase. H&H also shared a showroom space/office in Manhattan in the garment district, and hired its first employee. By this time, growth in our wholesale sales combined with success selling direct to consumers via the Website was complemented by press exposure for our products. In 2006, H&H reached over $1,000,000 in sales. H&H then focused on developing lines for mainstream national fashion chains and was able to land a very lucrative contract for fulfillment to a nationally recognized ladies clothier. At the same time, H&H leveraged its overseas knowledge to establish a relationship with a brand new Chinese factory called "Tomi Best Fashion Accessories Ltd" ("Tomi Best").

6. In 2007 as H&H's wholesale and online business continued to grow, the company moved warehousing into a larger space in Greenpoint and moved our designers to another storefront location in Greenpoint. The Debtor continues to occupy the aforementioned location at 211 Franklin Street, Brooklyn, New York 11222. At that point in time, H&H hired a print designer to work on custom prints and assist with the Website. Ms. Hacker was also assisted by an apparel designer to launch H&H's first official collection of Hayden-Harnett apparel. The market reaction to the expanded offering was exceptional. H&H continued to grow in response to customer demand. During this period, H&H found it necessary to retain the services of a public relations

agency and move into a larger showroom space, one occupied solely by H&H in Manhattan with full-time staff. Its new second retail showroom was located at 16 West 36th Street, Suite 501, New York, New York 10018. H&H paid a security deposit to the landlord of the 16 West 36th Street, Beach Plaza Corporation, in the amount of $16,000. During this expansion, H&H's newly established relationship with Tomi Best enabled H&H to increase volume on factory orders due in part to increased demand for H&H goods and Tomi Best's own desire to have the factory operating at 100% capacity. This enabled H&H to increase its orders to fill Tomi Best's capacity and in turn resulted in Tomi Best extending favorable and sometimes "loose" payment terms to the Debtor. We slated the company to expand sales with this move and were able to find more wholesale business and increase online sales. In 2007, H&H reached over $3,000,000 in sales.

7. Still a relatively "mom and pop" operation in terms of its credit profile, that same year H&H made efforts to improve its financial stability by eliminating the Debtor's need to rely on high interest credit loans to enable the company to purchase inventory. I caused H&H to take a loan of $25,000 from a family member of mine and later on as the business expanded; H&H added to it a loan from the Brooklyn Cooperative.

8. In early 2008, H&H became an Empire Zone certified business, due to the location of its warehouse space. At the same time, Tomi Best began producing their own handbag collection, but when the factory could not sell its inventory, Tomi Best asked H&H to take the inventory and sell it for whatever the Debtor could. Coupled with the H&H brand that had grown meteorically since inception three years earlier, H&H was able to quickly sell the inventory to the Debtor's wholesale customers, which included

4

amidst hundreds of smaller boutiques, some of the nation's largest and best known "high end" department stores. By 2008, though H&H had a large inventory due to increased manufacturing in China, debts to Tomi Best were manageable and paid regularly without issue. However, to ensure liquidity, the Debtor sought out additional financing.

9. On February 21, 2008, H&H became a party to a US Small Business Administration Loan (the "SBA Loan") issued by Flushing Saving Bank, FSB ("Flushing") in the face amount of $86,000. On the same date H&H also entered into a line of credit agreement for the total amount of $60,000 (the "LOC") also with Flushing. The SBA Loan and the LOC are secured by first priority liens on all of the Debtor's "personal property." The proceeds of the SBA Loan and LOC were used to satisfy the Brooklyn Cooperative Loan. The SBA Loan and LOC were further secured by personal guarantees of repayment by both myself and Ms. Hacker.

10. Though sales increased to $5,000,000 in 2008, operating expenses grew alongside. Specifically, though H&H's wholesale division accounted for only half of all sales, it was responsible for two-thirds of all company expenditures. Similarly, the Debtor began to witness deterioration in its accounts receivables with many customers simply refusing or becoming unable to pay their bills.

### C. The Credit Crisis

11. As it is now well known, late 2008 and early 2009 marked the beginning of an unprecedented credit crisis in the financial markets. Though I understand that the primary factor in the lack of liquidity in the marketplace was the subprime real estate market, these events also caused a sharp downturn in consumer spending in the United States which cast a negative forecast for growth in the fashion industry sector as a whole.

12. In response to the crisis, H&H sought to take on additional financing in order to reduce its debt and reliance on its overseas factory supplier, Tomi Best. It was determined that in response to what had become a new era of retail sales (i.e. perpetual "sale" coupled with deep discounts) H&H would best be served by bringing on a team of experienced wholesale representatives. Though at the time at least one major brand approached H&H to discuss a possible acquisition and integration, it was determined that the terms of the proposed buyout and merger were not in the best interest of the company and thus, the deal was rejected.

13. Yet, by early 2009, wholesale sales began to stagnate and decrease, with smaller boutiques cutting down their total order size and larger department stores beginning to tighten their budgets. New sales became more difficult to procure and expenses resulting from staff, travel, trade shows, concessions, look books, and other promotional materials and costs began to exceed their value. Surprisingly, throughout this period direct to customer sales through the Debtor's Website soared alongside retail sales at our Brooklyn storefront. Based on our retail sales numbers H&H entered into a lease agreement for retail space in SOHO at 253 Elizabeth Street, New York, New York 10012. The Debtor was required to make a security deposit of $25,500 payable to 253 Elizabeth Street Realty LLC.

14. Consistent with efforts to reduce the Debtor's reliance on overseas credit, H&H made a strong push to liquidate existing inventory in late 2008 and early 2009. The proceeds of this liquidation were used to make a substantial "pay down" to its China

factory, Tomi Best, which was carrying a balance of approximately $1,500,000.[2]  By January 2009, the remaining debt to Tomi Best was approximately $600,000.

15. H&H showed strongly for fashion week 2009 and was able to procure orders from several "fifth avenue" department stores.  At the same time the Debtor was selling successfully into one major discount chain across the country with an exclusive line designed by H&H for that particular retailer.  While operating expenses were high, continued strong internet sales covered over the weaknesses in wholesale operations.  However, the economic climate was further deteriorating as H&H saw even more difficulty collecting on its accounts receivable and then suffered the loss of one of its strongest wholesale customers, Searle, with that company's chapter 11 filing.

16. With a great deal of work in progress and customer orders in hand, the Debtor projected that despite the turbulent economic climate for most fashion companies, it would be relatively unaffected by the losses in the greater economy as it had "solid" commitments from major department stores.  This optimism was later shattered upon learning from Tomi Best that the Debtor's previous estimated $900,000 "pay down," was deemed insufficient by Tomi Best despite prior assurances.  The factory demanded an additional several hundred thousand dollars towards its back debts or would refuse to deliver the spring collection.  Though efforts were made to procure the funds, the Debtor was reluctantly forced to inform wholesale customers, whose dollars were already tenuous, that it would be unable to deliver the goods they had ordered in a timely manner.  While late deliveries are "de rigeur" in the fashion community, when budgets are tight orders are simply "canceled."

---

[2] This was particularly problematic for the Debtor since it felt that certain manufacturing defects were accepted despite missing specifications and certain orders were not delivered in a timely manner. Nonetheless, H&H persevered to maintain its relationship with Tomi Best.

7

17. More than half of the Debtor's expected new inventory was not shipped from the factory, despite being finished by Tomi Best. At the same time the Debtor had been in talks with its lender Flushing concerning increasing its credit line in light of its strong performance in 2008; however, the Debtor was informed Flushing was decreasing their lending, not increasing it.

### D. Efforts to Acquire Working Capital

18. The Debtor then strived to contact almost every factoring company and purchase order financing business we could locate; however, the Debtor was still unable to procure credit to fulfill shipments. The Debtor then attempted to procure merchant capital advances, personal loans, private placement investors, and made herculean efforts to put in every penny of my and Ms. Hacker's personal funds. For instance, an effort to obtain funds through a merchant capital advance failed after two months of back and forth when they announced that they would not advance any cash after all because of the business we were in, despite signed contracts and our already switching over our merchant accounts. After several late payments, our credit lines on every existing credit card we had were slashed to the balance, or closed completely. Thus, notwithstanding our contributions, credit and capital was simply insufficient or not available.

19. Despite this lack of liquidity and inability to meet customer demand, and having been crippled with only 1/5th of the inventory levels of the previous year, in 2009 internet sales exceeded those in prior years. In fact, the Website sales outpaced wholesale sales, and were the only reason the company was able to remain profitable. Even though the Debtor's wholesale sales that year were on zero or negative margins, our optimisim on wholesale was backed by orders from good customers, including several

8

fifth avenue departments stores, exceeding $400,000 for Spring alone. Despite these frustrations, the Debtor managed to pre-book more than ever while expanding brand awareness. Internet sales were matching all-time highs with stale inventory, and while we were not getting any traction with bank lending, we had serious interest from a half-dozen potential equity partners. At this point, we determined, very reluctantly, to layoff our entire wholesale staff to ensure the Debtor's survival.

   E.   **Third Party Investments & Financing**

20.  In early 2009, the Debtor was able to procure a merchant advance capital loan from another lender, Merchant Capital Advance LLC, located in Huntington Beach,[3] California, and additionally obtained more capital from personal loans made by myself and Ms. Hacker, through personal loans we secured, to enable the Debtor to retrieve its Spring goods from Tomi Best. Though incredibly late, the timing of these deliveries was sufficient to enable the Debtor a small jump ahead into its Spring preorders from marquee fifth avenue retailers. We had cut our operating expenses by 20-30%, had maintained or grown our online business, had robust sales at our Brooklyn store, and terrific monthly sales from our newly opened store in SOHO. The Manhattan store had achieved our projected break-even sales much faster than we anticipated, and was looking to outpace our projections for 2010. The sales staff we did not let go were helping small designers from the New York area to sell wholesale and earning a small commission – the Debtor was almost covering costs at the showroom space. Though the Debtor had become somewhat delinquent on certain employment tax obligations to the State of New York, we were optimistic that revenue from Spring deliveries would offset these short terms difficulties.

---

[3] The funds obtained from Merchant Capital Advance were repaid in full prior to the Petition Date.

21. Then, unforeseeably, because the Debtor was unable to fulfill early deliveries to a local well-known design house, orders were cancelled. Additionally, all wholesale orders were cancelled as well since the Debtor was behind with its factory and unable to make timely deliveries. The Debtor preserved based on past sales and anticipated that once it finally received the goods from its manufacturer, it would make up the difference with strong direct to customer orders, and small boutiques who always ordered late. We saved even more money on showroom rent and commission costs. The Debtor met most of its obligations, but continued to accrue tax debt. The Debtor was then again reluctantly forced to endure another round of layoffs and pushed aggressively on internet sales.

22. During the next six month period, we had numerous parties approach the Debtor to purchase the company. The Debtor came extremely close to consummating transactions for a sale of the company to a third party Texas based private equity fund in a deal brokered by a business manager that was brought on by the company. During the negotiations and document exchange with the Texas based group, the business manager was able to procure a short term high interest "hard money" loan from Joann Glussich, a wealthy individual based in New Jersey. On May 17, 2010, the Debtor entered into a promissory note and repayment agreement in the face amount of $150,000 bearing interest at the rate of twenty-four (24%) per annum (the "Glussich Loan"). The Glussich Loan purports to be secured by a second priority lien on all of H&H's personal property and is further secured by personal guarantees issued by myself and Ms. Hacker. After fees and expenses associated with procurement of the loan were deducted, the Debtor received just over $140,000 from the Glussich Loan.

23. After months of back and forth with the Texas based private equity group, on Labor Day 2010, the Debtor received its term sheet. The terms of the offer were substantially different from those discussed. In addition to now contemplating a bankruptcy filing, the proposal required the Debtor to divest itself of as many obligations as possible. With great reluctance and under the advice of its business manager, we agreed. At that point, it was determined that we would need to vacate the space in SOHO as part of an overall plan to implement the transaction with the new investors. After reaching a consensual resolution for return of the 253 Elizabeth Street location, the Debtor vacated the space. By this time, though the company was undergoing its stresses from its lack of liquidity, the Debtor's Website and retail numbers remained strong and in fact it was during this period that the Debtor was approached by the Walt Disney World Company ("Disney") to design certain merchandise. The Debtor entered into agreements with Disney which led to the fulfillment of orders and that agreement later led to the creation and design of a new Disney collection for one of its most recent films.

    F.    **The BAC Realignment**

24. Nearing the conclusion of discussions with the Texas based fund, the Debtor came to meet the principal of Bags Acquisition Corp ("BAC"), Mr. John Yoo. Mr. Yoo is the owner of well known family owned accessories business in New Jersey producing inexpensive hats and cold weather wear. Through their relationship with a major department store chain, they had a multi-million dollar opportunity to enter into the handbag market. Mr. Yoo was hoping to form a new company, which would later become known as BAC, and license a brand to enter into the handbag market with this retailer and was extremely interested in the Debtor. Not yet having committed to the Texas group, Mr. Yoo insisted that his group be given an opportunity to set forth a

11

proposal for the acquisition of the Debtor. Though we expressed concern that timing was extremely tight, we reluctantly agreed in light of what had been presented as an incredible opportunity for the Debtor.

25. BAC made an incredibly attractive proposal to the Debtor which envisioned the giving of a license by the Debtor to immediately forestall any impairment to operations and brand value as the terms of an asset purchase agreement were discussed. Though it was discussed that the license could not be exclusive or it would impinge on the right of the lien holders, there is at present some dispute about the interpretation of the effect of the license agreement. In the interim, the Debtor continued to operate as best it could given its limited operating capital but continued to maintain the business given its strong retail sales, continued customer loyalty, and brand recognition.

26. After several months, though BAC made certain capital contributions to the Debtor, despite the nonexistence of any formal loan documentation, the relationship between H&H and BAC began to deteriorate. The central point of the dispute concerned BAC's unwillingness to make capital contributions to H&H and deliver an asset purchase agreement for the purchase of the company to the Debtor as agreed. In an abundance of caution, we then reopened talks with various potential partners, purchasers and private individuals. Each one was intrigued by our success in growing our sales from 2010 to 2011, in maintaining and growing our brand esteem, in presenting a plan for increasing revenues without significant additional investment, and in the potential of the brand and all categories as well as the allure of our domestically manufactured products.

27. By this time however, it was too late, in light of prepetition suits initiated by its senior secured lender, its former SOHO landlord, aggressive collection activity by

the State of New York, and the dispute over the effect of the license agreement with BAC, the Debtor deemed it necessary and appropriate to initiate these proceedings.

### G. Prepetition Litigation & Material Disputes

28. The Debtor is party to a prepetition lawsuit venued in the Supreme Court of the State of New York, Nassau County bearing Index No. 2804/2011, captioned *Flushing Saving Bank, FSB vs. Hayden Harnett, LLC et al*. The Debtor filed an answer to the Plaintiff's complaint in the matter and at the present time a motion for summary judgment from the Plaintiff is returnable before the Supreme Court on July 29, 2011.

29. The Debtor is party to a prepetition lawsuit venued in the Supreme Court of the State of New York, New York County, captioned *253 Elizabeth Street Realty LLC vs. Hayden Harnett LLC et al.,* bearing Index No. 115357/2010. The Debtor did not respond to the complaint in this matter but was at the drafting stage of implementing an agreement fully resolving the Plaintiff's claims in the case when the intervening bankruptcy petition was initiated. The Plaintiff obtained a judgment by default against the Debtor and was awaiting, prior to settlement talks, an inquest date.

30. On March 10, 2011, the Debtor received a Notice of Default from counsel in connection with the Glussich Loan. The Debtor has been in talks with counsel for the Glussich Loan, though no suit has yet been initiated.

31. In mid March of 2011, the Debtor's operations were seized by the New York State Department of Taxation And Finance, Collections and Civil Enforcement Division. Within two days of the seizure the Debtor was able to negotiate an interim payment arrangement to permit the return of its premises. The Debtor was able to make significant large payments towards this liability by liquidating certain inventory and agreed through counsel to an interim payment arrangement based on ability to pay.

Despite having prepared an exhaustive packet and application for an installment agreement, the State of New York has yet to process the same and continues, though less frequently, to conduct enforcement activity notwithstanding the Debtor's diminished financial condition. The matter remains in active collection.

32. The Debtor was also party to a prepetition dispute with the Internal Revenue Service concerning certain unpaid income and employment taxes. Prior to the Petition Date the Debtor was able to place the IRS's collection activities into currently non-collectible status.

### H. The Debtor's Objectives in Chapter 11

33. In the six-months leading to the Petition Date, revenues have increased 18% over the previous six months, while web traffic on the Website has remained strong, and new services, including our Bespoke Scarf Service, an upcoming Bespoke Handbag Service, co-branding and licensing opportunities and interest from our overseas manufacturers in expanding the brand in the Asian markets as well as opportunities to franchise our store locations broods well for the overall success of the Debtor. Additionally a number of vendors and creditors have expressed the desire to come to arrangements to keep the brand strong without the need of jeopardizing the viability of H&H.

34. However, in light of the extensive and persistent array of financial pressure asserted against the Debtor by certain parties, H&H had no choice but to seek Chapter 11 protection. The Debtor anticipates using the Chapter 11 process to: (a) consummate a working capital debtor-in-possession facility sufficient to restructure and reorganize its business affairs in order to bring H&H back to its maximum potential; or (b) consummate a sale of its assets through a sale pursuant to section 363 of the

Bankruptcy Code. The Debtor is optimistic of its reorganization efforts as it believes that it is well prepared for the challenges and hurdles imposed by the conversion to debtor-in-possession status and feels strongly that the relief afforded by the automatic stay will permit the Debtor the needed time and opportunity necessary to consummate either of the above transactions for a company that has consistently demonstrated strong sales, premier brand recognition, and the promise of future success.

### **INFORMATION REQUIRED BY LOCAL RULE 1007-4**

35. Local Rule 1007-4 requires that certain information related to the Debtor be set forth in the form of an affidavit which I submit is in large part set forth above.

36. To the extent not so identified above, the Debtor submits the following additional information:

    (a) The Debtor is a small business as that term is defined under 11 U.S.C. 101(51D);

    (b) The filing of this case is not a conversion from any other chapter of the Bankruptcy Code, as such no trustee or creditor committee has been organized or appointed prior to the initiation of these proceedings;

    (c) The Debtor has filed contemporaneously herewith a copy of its 20 largest unsecured creditors and the relevant information concerning its secured creditor body is set forth above;

    (d) The Debtor's primary assets are its intellectual property and general intangibles which is in the custody and control of the Debtor, further, the Debtor maintains the overwhelming majority of its inventory at its principal place of business at 211 Franklin Street, Brooklyn, New York. A portion of the Debtor's inventory is presently in the custody and possession of Quiet Logistics, Darby French, 19 Connector Road, Andover MA 01810, Tel. (617) 650-6726, Attn: Joe Nentwig; and certain finished goods which are the subject of a payment dispute

are located in the People's Republic of China, Tomi Best Fashion Accessories Ltd., Room 1103, Yen Sgeng Center, 64, Hoi Yeun Road; Kwun Tong, Kowloon, Hong Kong, Tel.: (852) 2342-9888 / Fax: (852) 2342-9000; and also in Country of South Korea with Brio Corp., Attn: PJ Suk, #20-18 Shinweol 5 Dong Yang Chun Gu, Seoul, South Korea, 158822, Tel. 8-222-601-6101.

(e) The Debtor's Books and Records are maintained at its principal place of business at 211 Franklin Street, Brooklyn, New York.

(f) The Debtor's proposed 30 day payouts and compensation of officers and directors of the company are annexed to its Motion for Authority to Use Cash Collateral as **Exhibit "A."** discussed below.

## I. FIRST DAY MOTIONS

37. In connection with its conversion to debtor-in-possession status, the Debtor has filed contemporaneously herewith the following motions and applications for which the Debtor is seeking consideration on an expedited basis in accordance with Administrative Order No. 565 issued July 6, 2010 by the Honorable Carla E. Craig, Chief United States Bankruptcy Judge for the Eastern District of New York:

1. **MOTION FOR EXPEDITED CONSIDERATION OF CERTAIN FIRST DAY MOTIONS**

   *The Debtor submits that this motion is necessary and appropriate in order to ensure a smooth transition into chapter 11 and enable the Debtor to maintain certain necessary and critical policies and procedures to ensure its successful reorganization while preserving its ability to operate and manage its affairs pursuant to sections 1108 and 1109 of the Bankruptcy Code.*

2. **DEBTOR'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(A), 362, 1107 AND 1108 CONFIRMING ORDINARY COURSE BUSINESS PRACTICES AND IMPOSITION OF AUTOMATIC STAY**

   *The Debtor submits that because of the nature of its business, retail fashion, that this Motion is necessary to*

*enable the Debtor to ensure customers are not misled into perceiving the Debtor's operations as having ceased and to ensure the Debtor's ability to reorganize is not jeopardized; the Debtor further submits that the portion of its motion seeking to ensure the enforcement of the automatic stay is necessary to protect the Debtor from overly aggressive collection actions by creditors and to ensure that its overseas creditors do not act in derivation of the requirements of 11 U.S.C. § 362.*

3. **DEBTOR'S MOTION FOR ORDER PURSUANT TO FED. R. BANKR. P. 1007 AND LOCAL RULE 1007-1 GRANTING AN EXTENSION OF TIME WITHIN WHICH THE DEBTORS MUST FILE: (A) A STATEMENT OF FINANCIAL AFFAIRS AND (B) SCHEDULES OF (I) ASSETS AND LIABILITIES, (II) CURRENT INCOME AND EXPENDITURES; AND (III) EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

   *The Debtor submits that this motion is necessary to enable the Debtor to provide a complete and accurate list of its assets and liabilities to ensure full and complete disclosure to the Court, creditor's and other parties in interest. Given the exigency of the instant chapter 11 filing the Debtor was simply unable to devote the necessary care and attention to meaningfully complete all aspects of its required schedules and statements.*

4. **DEBTOR'S MOTION FOR AUTHORIZATION TO (I) MAINTAIN CERTAIN CUSTOMER PROGRAMS AND (II) HONOR OR PAY RELATED PREPETITION OBLIGATIONS TO THEIR CUSTOMERS**

   *The Debtor submits that this motion is necessary to ensure the continued patronage of H&H's customers, maintain its integrity, and brand value. The Debtor's loyal customer base has relied upon H&H's representations concerning the high quality of its products and wishes to ensure continuity of its programs pending this reorganization proceeding.*

5. **DEBTOR'S APPLICATION FOR AN ORDER (A) AUTHORIZING DEBTOR'S INTERIM AND FINAL USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 361 AND 363 AND GRANTING ADEQUATE PROTECTION AND (B) SCHEDULING FINAL**

**HEARING PURSUANT TO 11 U.S.C. § 363(c)(2) AND FED.R.BANKR.P. 4001**

*The Debtor submits that this motion is necessary to preserve the Debtor's ability to reorganize its affairs in this case as the Debtor requires access to inventory and offspring secured by liens in order to operate its business in the ordinary course.*

I affirm under penalty of perjury that the foregoing is true and correct.

Dated: July 24, 2011
New York, NY

/s/ *Benjamin Harnett*
Benjamin Harnett

Sworn to before me this 24st
day of July 2011

/s/ Patricia Wingate
Notary Public State of New York
NO.
Qualified in Otsego County